JL

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Jonathan M. Arther,

Plaintiff,

v.

Corizon Health Incorporated, et al.,

Defendants.

No.   CV-20-00189-PHX-JAT (JFM)

**ORDER**

## I.    Procedural History

Plaintiff Jonathan M. Arther, who is currently confined in the Arizona State Prison Complex (ASPC)-Tucson and is represented by counsel,[1] brought this civil rights action pursuant to 42 U.S.C. § 1983.  Defendants Eye Doctors of Arizona PLLC and Dr. Warren Heller move for summary judgment on the merits of Plaintiff's Eighth Amendment medical care claims.  (Doc. 122.)  Defendants State of Arizona, Corizon Health Incorporated (Corizon), Dr. Christopher Lee Johnson, and Registered Nurses (RNs) Kimberly Marie Brinton, Claudine C. Kabongo, and Cynthia Glee Walton-Sparks separately move for summary judgment on the merits of Plaintiff's Eighth Amendment medical care claims and filed a Joinder in Defendants Eye Doctors of Arizona and Heller's Motion for Summary Judgment.  (Doc. 131.)  The Motions are fully briefed.  (Doc. 138, 149, 154, 155).

After the summary judgment briefing was complete, Defendant Corizon filed a Suggestion of Bankruptcy and Notice of Automatic Stay.  (Doc. 158.)  On March 10, 2023,

---

[1] Plaintiff was pro se when he filed the original Complaint.

the parties filed Responses to the Notice of Automatic Stay.  (Docs. 160, 161, 162.)  In a March 13, 2023 Order, the Court noted that Corizon and the five non-debtor co-Defendants—that is, the State of Arizona, Johnson, Walton-Sparks, Brinton, and Kabongo—had not filed a motion in the bankruptcy proceeding to have the automatic stay extended to this case or applied as to the non-debtor co-Defendants. (Doc. 163.)  The Court further determined that the automatic stay did not apply to any of Corizon's co-Defendants. (*Id.*)

On April 26, 2023, Defendants State of Arizona, Johnson, Walton-Sparks, Brinton, and Kabongo filed a Motion to extend the deadline to file a motion to extend the stay in the bankruptcy proceeding.  (Doc. 166.)  In a May 12, 2023 Order, the Court granted the Motion and gave Defendants until May 15, 2023 to file a motion to extend the stay in Corizon's bankruptcy proceedings.  (Doc. 167.)  It appears Defendants did not file a motion to extend the stay in the bankruptcy case.

## II.    Fourth Amended Complaint

As relevant here, in the Fourth Amended Complaint (FAC), Plaintiff asserts claims regarding inadequate treatment of his eye conditions, which ultimately resulted in total loss of vision in his left eye.  (Doc. 66 at 2.)  In addition to Defendants Eye Doctors of Arizona, Heller, State of Arizona, Corizon, Brinton, Johnson, Kabongo, and Walton-Sparks,[2] Plaintiff also named as Defendants former Arizona Department of Corrections, Rehabilitation and Reentry (ADC) Director Charles Ryan, Correctional Officers Ferman and Stevens, and the "IFF Liaison."  (*Id.* at 1-2.)

In a July 15, 2021 Order, the Court dismissed Ryan for failure to serve.  (Doc. 78.)  In a September 13, 2021 Order, the Court dismissed Defendants Ferman, Stevens, and IFF liaison for failure to prosecute.  (Doc. 96.)  The remaining claims are Counts One, Two, and Three.

In Count One, Plaintiff asserts a claim under Arizona Revised Statutes, § 31-201.01,

---

[2] Defendants Brinton, Walton-Sparks, Johnson, and Kabongo were fictitiously identified in the Fourth Amended Complaint but were later substituted.

against the State of Arizona.  (*Id.* at 9-10 ¶¶ 66-75.)  In Count Two, Plaintiff asserts an Eighth Amendment claim against Defendants Heller, Brinton, Johnson, Kabongo, and Walton-Sparks for deliberate indifference to his serious medical needs.  (*Id.* ¶¶ 76-147.)  In Count Three, Plaintiff asserts a claim based on policy, practice, or custom against Defendants Eye Doctors of Arizona and Corizon.  (*Id.* ¶¶ 148-168.)

The remaining Defendants seeks summary judgment.

### III.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

1   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

2   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

3   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

4   **IV.    Facts**

5          The following facts are relevant to both Motions for Summary Judgment.

6          Plaintiff is a prisoner in the custody of the Arizona Department of Corrections,

7   Rehabilitation and Reentry.  While he was in custody, he began to experience increased

8   pressure in his left eye and blurry vision.  (FAC ¶ 3.)  On December 5, 2016, Plaintiff saw

9   Nurse Practitioner (NP) Christine Armenta for intake.  (Doc. 132-1 at 2.)  Plaintiff reported

10  a nine-year history of type 2 diabetes and a retinal tear secondary to eye trauma.  (*Id.*)

11  Plaintiff could not recall his last diabetic eye exam or who diagnosed him with a retinal

12  tear.  (*Id.*)  NP Armenta noted that Plaintiff was taking 1000 mg of metformin, a diabetes

13  medication, and that she would continue the metformin and would refer Plaintiff for routine

14  follow-up once he was placed on a yard.  (*Id.* at 4.)

15         On February 24, 2017, Plaintiff saw Dr. Adelberg at Southwest Eye Center.  (FAC

16  ¶ 6.)  Dr. Adelberg diagnosed Plaintiff with a moderately sized macular hole and

17  recommended surgical intervention.  (*Id.* ¶ 7.)  Dr. Adelberg prescribed Ofloxacin OS to

18  start one day prior to surgery and a Prednisolone Acetate OS until the bottle was gone,

19  starting the day after surgery.  (*Id.* ¶ 8.)  On March 29, 2017, Dr. Adelberg performed

20  surgery on Plaintiff's left eye.  (Doc. 132-1 at 70.)  Subsequently, Plaintiff experienced

21  severe pain and significant pressure in his left eye.  (FAC ¶ 11.)  On April 4, 2017, Dr.

22  Adelberg prescribed additional medication to decrease the pressure in Plaintiff's left eye.

23  (*Id.* ¶ 12.)

24         Thereafter, Plaintiff was moved to ASPC-Florence North Unit.  (*Id.* ¶ 13.)  The

25  medication Dr. Adelberg prescribed was not transferred to ASPC-Florence.  (*Id.* ¶ 15.)  On

26  May 3, 2017, Plaintiff saw Defendant Walton-Sparks for intake.  (Doc. 132-1 at 10.)  In

27  the Plan Notes for the visit, Defendant Walton-Sparks noted, "Pt takes kop [keep on

28  person] meds-from  private  prison-call  to  on[-]call  provider-received  orders  for

medication." (*Id.* at 12.)  Defendant Walton-Sparks did not review Plaintiff's medical chart, and her intake notes do not mention that Plaintiff underwent retinal surgery the previous month, was experiencing significant and ongoing pain, and was being treated by the surgeon, Dr. Adelberg.  (PSOF ¶ 2.)  The same day, Chizoba Ngwube entered a verbal order of 1000 mg of metformin for Plaintiff to keep on his person.  (*Id.* at 12, 14.)

Plaintiff was supposed to have a follow-up visit with Dr. Adelberg on May 9, 2017 to have his intraocular pressure checked, but he did not.  (PSOF ¶ 4.)  On May 11, 2017, Plaintiff saw Defendant Johnson for chronic care related to his diabetes.  (Doc. 132-1 at 21.)  During the visit, Plaintiff reported vision issues and stated that his last eye exam occurred on March 4, 2017.  (*Id.*)  Plaintiff denied diabetic retinopathy.  (*Id.*)  Plaintiff reported that he had eye surgery in April and was supposed to continue using eyedrops after his surgery and have a follow-up visit with the surgeon.  (*Id.* at 26.)  Plaintiff reported he was kicked in the eye two years prior, which created a macular hole.  (*Id.*)  Plaintiff requested a follow-up visit with his eye surgeon and prescriptions for dorzolamide and Combigan.[3]  (*Id.* at 28.)  Defendant Johnson conducted a physical examination and assessed a macular hole based on Plaintiff's reported history.  (*Id.*)  Defendant Johnson ordered dorzolamide three times daily, timolol three times daily, and brimonidine three times daily.  (*Id.* at 27.)

Following the May 11, 2017 visit, Defendant Johnson submitted a routine consultation request for Plaintiff to see an offsite ophthalmologist.  (*Id.* at 29.)  In the request, Defendant Johnson noted that Plaintiff underwent repair of the macular hole on March 29, 2017, and he was supposed to have followed up with the surgeon on May 9, 2017, but he had been transferred from a private prison to ASPC-Florence and did not make the May 9 appointment.  (*Id.*)  Defendant Johnson requested authorization for post-operative follow-up and recommendations for continuation of several medications.  (*Id.*)

---

[3] Dorzolamide is used to treat increased pressure in the eye caused by open-angle glaucoma or hypertension of the eye.  Combigan combines brimonidine tartrate and timolol maleate solution and is used to treat high pressure inside the eye due to glaucoma or other eye diseases.

The request was reviewed and approved by Corizon's Utilization Management Team, and an appointment was scheduled for June 16, 2017.  (*Id.* at 32.)  Between May 11 and June 13, 2017, Defendant Johnson did not follow up on the consultation request.  (PSOF ¶ 8.)

On May 15, 2017, Plaintiff received the dorzolamide, timolol, and brimonidine eyedrops.  (PSOF ¶ 9.)  Plaintiff was not told how to properly administer the eyedrops, and he experienced negative side effects when he started using the drops.  (PSOF ¶¶ 5, 9.)

On May 24, 2017, Plaintiff submitted an HNR stating his left eye was painful, tearing up, and swollen.  (Doc. 132-1 at 47, 54.)  Defendant Brinton saw Plaintiff the same day.  (*Id.* at 47.)  Plaintiff reported recent left eye macular degeneration surgery and that he had been using eyedrops "hit or miss" in the last week, which was when his eye became red and blurry.  (*Id.* at 48.)  Plaintiff also reported that the blurry vision had been present since the surgery.  (*Id.*)  Plaintiff rated his pain at 7.5/10.  (*Id.*)  Defendant Brinton observed that his left eye was bloodshot.  (*Id.*)  Defendant Brinton contacted the pharmacist, who advised her that Plaintiff's eye drop medications should be administered one at a time with 5-10 minutes between medications.  (*Id.* at 52-53.)  Defendant Brinton communicated this information to Plaintiff, and he stated he would begin administering the medications as directed.  (*Id.* at 52-53.)

On June 6, 2017, Plaintiff submitted an HNR stating his eye was painful and tearing up.  (*Id.* at 60, 64.)  Defendant Walton-Sparks reviewed the HNR and saw Plaintiff the same day.  (*Id.* at 60.)  Plaintiff stated he was taking eye drops, but they were irritating, painful, and made his eyes tear up.  (*Id.*)  Plaintiff reported stopping the eye drops three days prior and began using cold compresses.  (*Id.*)  Defendant Walton-Sparks checked his visual acuity, which was 20/20 in his right eye, but he was unable to read the chart with his left eye.  (*Id.*)  Defendant Walton-Sparks observed that his sclera was reddened and watery.  (*Id.*)  Defendant Walton-Sparks advised Plaintiff to continue using cold compresses and referred him to a provider for further evaluation.  (*Id.* at 62.)

On June 13, 2017, Plaintiff saw Defendant Johnson.  (*Id.* at 66.)  Plaintiff reported that he had a macular hole repaired in March 2017 and had seen the surgeon twice for

follow-up.  (*Id.*)  Plaintiff reported that he stopped using the eye medications on May 26, 2017 because they caused his eye to burn and tear, and he had swelling under the lower eyelid.  (*Id.*)  Plaintiff reported he initially used the eyedrops at the same time until advised to wait 10 minutes in between the drops.  (*Id.*)  Plaintiff stated that he saw the optometrist three days prior, who told him he should return to see his eye surgeon as soon as possible.  (*Id.*)  Plaintiff reported that during the visit with the optometrist, his eye pressure was 17 in the right eye and 27 in the left eye.[4]  (*Id.*)  Plaintiff reported that his eye felt fine without eyedrops, but when he used the eyedrops, his eye ached and was sensitive to light, and he was concerned he was allergic to the eyedrops.  (*Id.*)  Plaintiff also reported hazy vision.  (*Id.*)

Defendant Johnson examined Plaintiff's eyes, which were not red, swollen, or irritated.  (*Id.*)  Defendant Johnson noted his May 11, 2017 consultation request for ophthalmology was still pending.  (*Id.* at 68.)  Defendant Johnson noted that he spoke with the clinical coordinator and that they were attempting to get Plaintiff in to see the surgeon as soon as possible.  (*Id.*)  Defendant Johnson informed Plaintiff of the plan to get him scheduled as soon as possible.  (*Id.*)

On June 16, 2017, Plaintiff saw Dr. Adelberg.  (*Id.* at 70.)  Plaintiff reported that his eye was throbbing and painful, and he had blurry vision.  (*Id.*)  Dr. Adelberg noted that Plaintiff's intraocular pressure was 13 in his right eye and 35 in his left eye.  (*Id.* at 71.)  Plaintiff reported stopping his eyedrops two months prior because they made his eye swell and tear.  (*Id.*)  Dr. Adelberg advised him the side effects of not using glaucoma drops and potential damage that could occur.  (*Id.* at 71.)  Dr. Adelberg recommended Diamox to help reduce Plaintiff's eye pressure until he could see a glaucoma specialist, who could determine which eyedrops would be beneficial.  (*Id.*)  Dr. Adelberg noted that Plaintiff's retina was stable but had not closed all the way, that the surgery was partially successful,

---

[4] According to the Glaucoma Research Foundation, normal eye pressure ranges from 12-21 mm Hg, and eye pressure of greater than 21 mm Hg is considered higher than normal.  High eye pressure alone does not cause glaucoma, but it is a significant risk factor.  *See* https://glaucoma.org/high-eye-pressure-and-glaucoma/ (last visited Aug. 24, 2023).

and that additional surgery was not recommended due to his increased intraocular eye pressure and because it might not benefit Plaintiff in any event. (*Id.*) Dr. Adelberg recommended obtaining a glaucoma evaluation. (*Id.*)

On June 19, 2017, NP Joanna Burns ordered 250 milligrams of acetazolamide (the generic of Diamox) four times daily. (*Id.* at 77.) Defendant Walton-Sparks entered the order. (*Id.* at 73.)

On June 20, 2017, Defendant Johnson saw Plaintiff for follow-up after his visit with Dr. Adelberg. (*Id.* at 79.) Defendant Johnson reviewed Dr. Adelberg's report and noted that Dr. Adelberg had encouraged Plaintiff to use his prescribed eyedrops. (*Id.*) Defendant Johnson noted that Plaintiff continued to refuse to use the eyedrops, although Dr. Adelberg and Defendant Johnson advised him to use them. (*Id.*) Defendant Johnson noted that Dr. Adelberg had recommended referral to a glaucoma specialist and a prescription of Diamox four times daily in the interim. (*Id.*) Defendant Johnson noted that according to Dr. Adelberg's report, the surgery was partially successful in that the retina was stable, but the hold did not close all the way. (*Id.*) Defendant Johnson noted that additional surgery to "close the hole" was not recommended due to Plaintiff's increased intraocular pressure. (*Id.*) Defendant Johnson assessed Plaintiff as having glaucoma and prescribed 250 milligrams of acetazolamide four times daily, pursuant to Dr. Adelberg's recommendation. (*Id.* at 80.) Defendant Johnson also submitted an urgent consultation request for Plaintiff to see a glaucoma specialist, pursuant to Dr. Adelberg's recommendation. (*Id.* at 82.) The consultation request was approved by June 26, 2017, and an appointment was scheduled for August 7, 2017 with Defendant Heller. (Doc. 123-1 at 54.)

On June 28, 2017, Plaintiff refused a scheduled appointment with Defendant Johnson, stating that his "issue ha[d] improved." (Doc. 132-1 at 92.) On June 29, 2017, Defendant Johnson noted that Plaintiff was refusing to use his eyedrops as prescribed and that Plaintiff stated he was allergic to them. (*Id.* at 96.) Defendant Johnson noted that he and Dr. Adelberg had recommended that Plaintiff use the eyedrops, but Plaintiff refused to use them for the last two months. (*Id.*) Defendant Johnson noted that Plaintiff was taking

an oral medication for his intraocular pressure and that "[they were] awaiting approval" of a follow-up visit with the ophthalmologist.  (*Id.*)  The following day, Defendant Johnson discontinued the timolol, brimonidine, and dorzolamide.  (*Id.* at 98.)

On August 7, 2017, Plaintiff saw Defendant Heller.  (Doc. 123-1 at 43.)  Defendant Heller noted that the iris and fundi were both negative for diabetic retinopathy.  (*Id.*)  Defendant Heller noted that Plaintiff had a severe injury to his left eye and that he had surgery for a macular hole "several years" earlier, but his vision did not improve.  (*Id.*)  Defendant Heller noted that Plaintiff had macular edema and a "partial hole," but Heller did not think it was related to Plaintiff's decreased vision.  (*Id.*)  Defendant Heller recommended an Avastin injection, which was performed.  (*Id.*)  Defendant Heller noted he would see Plaintiff again in one month.  (*Id.*)  Defendant Heller sent short notes from the visit to Corizon on the date of the visit and sent the dictated report on August 22, 2017.  (*Id.* at 44-48.)[5]

After Plaintiff returned from the appointment with Defendant Heller, RN Stacey Fenwick reported to Defendant Johnson that Plaintiff returned without complication after receiving eye injections.  (Doc. 132-1 at 100.)  Defendant Johnson had no additional orders because he did not yet have detailed notes from the visit with Defendant Heller.  (*Id.*; Decl. of Christopher Johnson, Doc. 132-1 at 44 ¶ 11.)  Plaintiff was "denied access to prescribed ice upon his return to the prison[.]"  (PSOF ¶ 13.)

On August 8, 2017, Defendant Johnson reviewed the short notes from Plaintiff's visit with Defendant Heller and noted that Plaintiff needed follow-up with the ophthalmologist in one month.  (Doc. 132-1 at 105.)

On August 19, 2017, Plaintiff saw Dr. Michael Rowley for a chronic care visit.  (*Id.* at 107.)  Plaintiff requested ice because he had been receiving injections in his eye, but he was again "denied access to medically prescribed ice."  (PSOF ¶¶ 19-20.)  "Defendant[]s failed to correctly input medical information into Plaintiff's records."  (*Id.* ¶ 16.)

---

[5] Beginning May 20, 2015, Corizon requested that consultants complete a Practitioner Consultation Report on the date of service and within seven business days, to submit a typewritten Consultation Report to the Clinical Coordinator.  (*Id.* at 15.)

Plaintiff's medical records indicate that on August 19, 2017, Dr. Rowley entered an urgent consultation request for Plaintiff to see Defendant Heller.  (Doc. 132-1 at 112.)  The consultation request was reviewed and approved on August 28, 2017, and the appointment was scheduled for September 18, 2017.  (Doc. 123-1 at 57.)

On August 29, 2017, Defendant Johnson reviewed the detailed notes from Plaintiff's August 7, 2017 visit with Defendant Heller and noted that Plaintiff had received an Avastin injection.  (Doc. 132-1 at 119.)  Defendant Johnson noted that a follow-up consultation had already been requested by another provider.  (*Id.*)

On September 12, 2017, Defendant Johnson renewed Plaintiff's prescription for 5 milligrams glipizide twice daily for Plaintiff's diabetes.  (Doc. 132-1 at 124.)  Defendant Brinton entered the order the same day.  (*Id.* at 121.)

On September 18, 2017, Plaintiff saw Defendant Heller.   (Doc. 123-1 at 35.)  Defendant Heller noted that Plaintiff had a previous injury and surgery in his left eye and that Plaintiff had "what could just be swelling," but there was a "hole in it," which was possibly a macular hole.  (*Id.*)  Defendant Heller noted that he recommended an Avastin injection to reduce the swelling.  (*Id.*)  Defendant Heller noted that Plaintiff's vision in his left eye was "count fingers."  (*Id.*)  Defendant Heller assessed Plaintiff with macular edema in his left eye and noted that he would check Plaintiff in a month with an OCT[6] and that his condition appeared to be stable.  (*Id.*)  Defendant Heller sent short notes to Corizon on the day of the visit and sent the dictated report on September 27, 2017.  (*Id.* at 35-38.)

On September 18, 2017, Plaintiff returned from his appointment with Defendant Heller and saw Nursing Director Phyllis Raney.  (Doc. 132-1 at 126.)  Raney noted that Plaintiff was to follow up in one month and that Dr. Babich was notified of Plaintiff's return "with no orders noted."  (*Id.* at 128.)

On October 5, 2017, Plaintiff saw Dr. Rowley.  (*Id.* at 131.)  Plaintiff told Dr. Rowley that he was supposed to see Dr. Heller in October to receive an Avastin injection.  (*Id.*)  Dr. Rowley noted that Plaintiff had seen an ophthalmologist and was assessed with

---

[6] Optical coherence tomography.

macular edema with a likely macular hole.  (*Id.*)  Dr. Rowley noted the ophthalmologist recommended an Avastin injection and follow-up in one month.  (*Id.*)

The same day, Dr. Rowley submitted an urgent request for a consultation with Defendant Heller. (Doc. 123-1 at 62.)  Dr. Rowley noted that Plaintiff had been diagnosed with "likely macular hole," and an Avastin injection was recommended, along with follow-up one month from the date of the service, or the end of October.  (*Id.*)  The request was reviewed and approved on October 13, 2017, and an appointment was scheduled for the week of November 13, 2017.  (Doc. 123-1 at 62.)

On November 14, 2017, Plaintiff saw Defendant Heller for an abnormality of his left macula. (Doc. 123-1 at 25.)  Defendant Heller examined Plaintiff's eye and noted that it "look[ed] more like a macular hole now," but it had some edema around it, and that if the edema were to "go down, perhaps the macula, which seems normal, possibly normal thickness, would restore his vision."  (*Id.*)  Defendant Heller noted that he gave Plaintiff an Avastin injection.  (*Id.*)  Defendant Heller noted that he asked Plaintiff to return in one month, but Plaintiff said "it is too cold to come then because they make him stand in the yard."  (*Id.*)   Defendant Heller noted that he told Plaintiff to return in two months, and Plaintiff "was happy with that."  (*Id.*)  Defendant Heller noted that he thought Plaintiff "should be followed up more frequently, though you cannot force him to get medical care." (*Id.*)  Defendant Heller sent the short notes to Corizon on the day of the visit and sent the dictated report on November 17, 2017.[7]  (*Id.* at 25-29.)

Plaintiff saw Nursing Director Raney after he returned from the appointment with Defendant Heller.  (*Id.* at 141.)  Raney noted that no new orders were given.  (*Id.*)

On November 16, 2017, Dr. Rowley submitted an urgent request for a consultation with Defendant Heller, noting that Plaintiff had been diagnosed with macular edema with "likely macular hole," an Avastin injection was given, and follow-up in one month for a repeat injection was recommended.  (Doc. 123-1 at 65.)  The request was reviewed and

---

[7] The Practitioner Consultation Report for the November 14, 2017 visit incorrectly notes the date of service as October 14, 2017.  (Doc. 123-1 at 29.)

approved on November 17, 2017, and an appointment was scheduled for the week of December 18, 2017. (*Id.*)

On November 20, 2017, Plaintiff saw Dr. Robert Patel. (*Id.* at 160.) Plaintiff told Dr. Patel that he was being punished and forced to stand outside in the cold, without clothing, for his offsite appointments. According to Plaintiff's medical records, during the visit with Dr. Patel, Plaintiff reported that he was no longer taking eyedrops and he was receiving eye injections. (*Id.*) Plaintiff reported that he was supposed to follow-up with his eye doctor in a month but requested to wait two months. (*Id.*) Dr. Patel submitted a routine request for a consultation with the ophthalmologist, noting that Plaintiff refused follow-up within one month and asked to wait two months. (*Id.* at 160, 163.) The request was reviewed and approved by November 28, 2017. (*Id.* at 163.) Plaintiff disputes the assertion that he asked to wait two months and asserts that he did not ask to wait two months to see Defendant Heller again. (PSOF ¶ 28.)

On December 18, 2017, Plaintiff saw Defendant Heller for follow-up for his diabetic retinopathy. (Doc. 123-1 at 21.) (*Id.*) Plaintiff had pressure of 12 in each eye and some mild macular edema. (*Id.*) Defendant Heller noted that Plaintiff told him that he "did not want to come now because they make him stand outside without his clothes on and he is cold." (*Id.*) Defendant Heller noted that he recommended that Plaintiff return on March 10, 2018, which was Plaintiff's "choice of day." (*Id.*) Defendant Heller sent short notes to Corizon on the day of the visit and sent the dictated report on December 27, 2017. (*Id.* at 21-24.) Plaintiff asserts that after the December 18, 2017 visit, Defendant Heller "decided to stop monthly follow up appointments and scheduled a three month follow up instead." (PSOF ¶ 30.)

Plaintiff saw Nursing Director Raney after his return from the visit with Defendant Heller. (Doc. 132-1 at 170.) Raney noted that Defendant Heller's office recommended follow-up in March 2018 but had no other orders. (*Id.* at 173.) Plaintiff's medical records state that on December 19, 2017, Plaintiff refused acetazolamide. (*Id.* at 176.) However, Plaintiff asserts that he did not "willingly refuse" the acetazolamide. (PSOF ¶ 31.)

On January 10, 2018, Plaintiff saw NP Deborah McGarry.  (*Id.* at 178.)  Plaintiff requested medical exemption from education due to his eye problems.  (*Id.*)  Plaintiff complained of blurred and worsening vision.  (*Id.*)  NP McGarry noted that Plaintiff was unable to complete the visual acuity evaluation and could not identify any letter on the first line of the chart.  (*Id.*)  NP McGarry noted that Plaintiff had an appointment with Defendant Heller scheduled for March 10, 2018, but Plaintiff requested that the appointment "be moved up so [he] can be evaluated immediately." (*Id.*)

The same day, NP McGarry submitted an urgent request for a consultation with the ophthalmologist, pursuant to Plaintiff's request.  (Doc. 123-1 at 74.)  NP McGarry noted that Plaintiff had a macular injury approximately two years earlier and had been followed by ophthalmology for macular edema.  (*Id.*)  NP McGarry also noted that Plaintiff previously underwent surgery that was partially successful in closing a macular hole and had been receiving intraocular injections of Avastin for the edema. (*Id.*)  NP McGarry noted that Plaintiff had an appointment with Defendant Heller scheduled for March 10, 2018 for a check of his intraocular pressure and a possible Avastin injection, but due to Plaintiff's worsening vision, McGarry "would like this to be rescheduled to happen as soon as possible." (*Id.*)  The request was reviewed and approved by January 11, 2018, and an appointment with Defendant Heller was scheduled for February 6, 2018.  (Doc.  123-1 at 74.)

On February 6, 2018, Plaintiff saw Defendant Heller.  (*Id.* at 16.)  Defendant Heller noted that Plaintiff presented with decreased vision in both eyes, which was much more severe in the left eye.  (*Id.*)  Defendant Heller noted that Plaintiff reported he had macular surgery in March 2017.  (*Id.*)  Defendant Heller noted that Plaintiff's visual acuity in his left eye was 20/300, and the interocular pressures were 17 OU.  (*Id.*)  Defendant Heller also noted that Plaintiff had cataracts in both eyes.  (*Id.*)  Defendant Heller diagnosed Plaintiff with a macular hole in both eyes, non-prolific diabetic retinopathy with cystoid macular edema in the left eye, and a mature cataract in the left eye.  (*Id.*)  Defendant Heller noted that he would observe the macular holes and the mature cataract and consider

treatment in the future.  (*Id.*)  Defendant Heller noted that Plaintiff reported improved vision with previous Avastin injections and requested another injection during the visit, which Defendant Heller did.  (*Id.*)  Defendant Heller sent short notes to Corizon on the date of the visit and sent the dictated report to Corizon on February 16, 2018.  (*Id.* at 16, 18-20.)

On February 8, 2018, NP McGarry reviewed notes from Plaintiff's February 6 visit with Defendant Heller.  (Doc. 132-1 at 192.)  NP McGarry submitted another urgent request for ophthalmology follow-up.  (*Id.* at 195.)  The request was reviewed and approved on February 12, 2018.  (Doc. 123-1 at 11.)

On March 6, 2018, Plaintiff saw Defendant Heller.  (*Id.* at 2.)  Defendant Heller measured Plaintiff's visual acuity as 20/400 in his left eye, examined Plaintiff retinas, which were attached, and checked the intraocular pressure in both eyes, which were within normal limits.  (*Id.*)  Defendant Heller noted that Plaintiff had a macular hole and some "bubbled up areas around it."  (*Id.*)  Defendant Heller noted that Plaintiff needed to be referred to a retinal specialist, and, although it was not an emergency, the referral should be done within a relatively reasonable time, one or two months.  (*Id.*)  Defendant Heller noted that he told Plaintiff that he might need surgical intervention in his left eye, but that was for the retinal specialist to decide.  (*Id.*)  The same day, Defendant Heller sent short notes regarding his diagnosis and recommendations for follow-up care.  (*Id.* at 3-4.)

## V. Defendants State of Arizona, Corizon, Brinton, Johnson, Kabongo, and Walton-Sparks's Motion

### A. State Tort Claim against State of Arizona

The State of Arizona argues that it is entitled to Eleventh Amendment immunity. Under the Eleventh Amendment to the Constitution of the United States, a state may not be sued in federal court without its consent.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Arizona Revised Statutes, § 31-201.01, governs the duties of the ADC Director with respect to medical treatment for ADC prisoners.  Under the statute, the director must "provide medical and health services for [] prisoners.  The director may contract for

professional services to assist the director in carrying out this responsibility on behalf of the state[.]"  Ariz. Rev. Stat. §  31-201.01(D).  The statute waives Arizona's immunity from suit in *state* courts, but it does not waive Arizona's Eleventh Amendment immunity from suit in *federal* courts.  Thus, Defendant State of Arizona is immune from Plaintiff's claim under § 31-201.01, and the Court will grant summary judgment in favor of the State of Arizona.

**B.   Corizon**

As discussed above, this case was automatically stayed as to Corizon due to its pending bankruptcy proceeding.  The Court will deny the Motion for Summary Judgment as to Corizon without prejudice to refiling as to Corizon if the stay is lifted.  Regarding the stay, Plaintiff is required to prosecute this case.  *See O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1110 (9th Cir. 2006) (stay did not preclude dismissal of case against debtor based on plaintiff's failure to prosecute).  To that end, Plaintiff shall either dismiss this case as to Defendant Corizon (without prejudice to pursuing any claims in bankruptcy court) or move the bankruptcy court to lift the automatic stay to allow this case to go forward in this forum.  As a result, claims against Defendant Corizon will be dismissed, without prejudice, without further notice on October 29, 2023, unless the Court is advised that the bankruptcy stay has been lifted, or a request for a lifting of the bankruptcy stay has not been ruled upon by the bankruptcy court.  If the stay is lifted, Corizon must refile its motion for summary judgment within 15 days of the stay being lifted.

**C.   Eighth Amendment Claims**

**1.   Legal Standard**

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096.  An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.  Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983).  "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference.  *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.

The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### 2. Serious Medical Need

Defendants do not dispute that Plaintiff's eye issues were a serious medical need. The evidence indicates that Plaintiff suffered a serious injury that required years of treatment, including two surgeries. The record supports the existence of a serious medical need. *See McGuckin*, 974 F.2d at 1059-60.

### 3. Deliberate Indifference – Individual Defendants

To demonstrate deliberate indifference, Plaintiff must show that "the course of treatment [Defendants] chose was medically unacceptable under the circumstances" and they chose this course "in conscious disregard of an excessive risk to [P]laintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted). A difference of opinion with a medical provider about the appropriate medical diagnosis or treatment does not establish a deliberate indifference claim. *Id.*

The inquiry into an individual defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see Rizzo v. Goode*, 423 U.S. 362, 370-71, 375–77 (1976).

### a. Defendant Walton-Sparks

The available evidence indicates that Plaintiff saw Defendant-Walton twice. Plaintiff contends that Defendant Walton-Sparks failed to ascertain the medications that were prescribed to Plaintiff during the May 3, 2017, intake appointment and failed to review Plaintiff's medical chart and medical records at the time of his intake appointment.

(Doc. 138 at 3.)  Plaintiff asserts that his medical records were "incorrect/incomplete" at the time of his transfer and that the eyedrops Dr. Adelberg ordered were supposed to be transported with Plaintiff on his person.  (*Id.*)  Plaintiff argues he was transported without his eyedrops, which "ultimately caused him significant pain and permanent vision loss."

Plaintiff has not presented any evidence to support that Defendant Walton-Sparks knew or should have known that his medical records were incomplete or inaccurate or that he told Walton-Sparks that he had been prescribed eyedrops that should have been transported with him but were not.  And even if Defendant Walton-Sparks should have, for example, asked Plaintiff whether he had been prescribed any other medication, that might constitute negligence, but it does not amount to deliberate indifference.

Plaintiff next saw Defendant Walton-Sparks on June 6, 2017.  Defendant Walton-Sparks checked Plaintiff's visual acuity, examined his eye, observed that the sclera was reddened and watery, advised Plaintiff to continue using cold compresses, and referred him to a provider for further evaluation.  The available evidence does not support that Defendant Walton-Sparks failed to address Plaintiff's pain and suffering.  Plaintiff has not presented any evidence to support that Defendant Walton-Sparks' actions during the June 6 visit were medically unacceptable under the circumstances.

On this record, no reasonable jury could conclude that Defendant Walton-Sparks was aware of and disregarded a substantial risk of serious harm to Plaintiff.  The Court concludes there is no genuine dispute of material fact regarding whether Defendant Walton-Sparks was deliberately indifference to Plaintiff's serious medical needs, and summary judgment will be granted in her favor.

### b.    Defendant Brinton

The available evidence demonstrates that Defendant Brinton saw Plaintiff once, on May 24, 2017.  During that visit, Defendant Brinton examined Plaintiff's eye, spoke to the on-call provider and the pharmacist, obtained instructions about administering the eyedrops, and conveyed this information to Plaintiff.  The only other evidence of Defendant Brinton's involvement in Plaintiff's medical care is that on September 12, 2017, Defendant

Brinton entered Defendant Johnson's order for renewal of Plaintiff's glipizide.

Plaintiff has not presented any evidence to support that Defendant Brinton failed to respond to his complaints or that the steps Brinton took were medically unacceptable under the circumstances.  On this record, no reasonable jury could conclude that Defendant Brinton was aware of and disregarded a substantial risk of serious harm to Plaintiff.  The Court concludes there is no genuine dispute of material fact regarding whether Defendant Brinton was deliberately indifference to Plaintiff's serious medical needs.

### c.      Defendant Johnson

The evidence indicates that Defendant Johnson saw Plaintiff on three occasions between May 11, 2017 and September 12, 2017.  During the May 11, 2017 visit with Defendant Johnson, Plaintiff requested a follow up appointment with Dr. Adelberg.  Defendant submitted a request for consultation with Dr. Adelberg.  Plaintiff contends that Defendant Johnson realized the urgent need for an ophthalmology consultation on May 11, 2017 but failed to take any action until June 13, 2017.  (*Id.* at 6.)  Although the consultation request was not approved by Plaintiff's next visit with Defendant Johnson, there is no evidence that Johnson was responsible for the delay in approving the consultation request or in scheduling the appointment with Dr. Adelberg.

Plaintiff next saw Defendant Johnson on June 13, 2017.  Defendant Johnson contacted the clinical coordinator for an update on the status of the ophthalmology consultation request and informed the coordinator that Plaintiff needed to be scheduled as soon as possible.  Plaintiff saw Dr. Adelberg three days later.

Plaintiff's final visit with Defendant Johnson was on June 20, 2017 after Plaintiff's visit with Dr. Adelberg.  Defendant Johnson reviewed Dr. Adelberg's findings and recommendations.  Defendant Johnson assessed Plaintiff as having glaucoma and prescribed acetazolamide pursuant to Dr. Adelberg's recommendation.  Defendant Johnson also submitted an urgent consultation request for Plaintiff to see a glaucoma specialist, pursuant to Dr. Adelberg's recommendation.

After the June 20, 2017 visit, Defendant Johnson's only involvement in Plaintiff's

care was that Johnson reviewed the notes from Plaintiff's August 7, 2017 visit with Defendant Heller, and Johnson renewed Plaintiff's prescription for glipizide.

Plaintiff has not presented any evidence to support that Defendant Johnson failed to respond to Plaintiff's complaints or that Johnson's decisions were medically unacceptable under the circumstances.  On this record, no reasonable jury could conclude that Defendant Johnson was aware of and disregarded a substantial risk of serious harm to Plaintiff.  The Court concludes there is no genuine dispute of material fact regarding whether Defendant Johnson was deliberately indifference to Plaintiff's serious medical needs.

### d.    Defendant Kabongo

According to the evidence in the record, Plaintiff saw Defendant Kabongo once, on June 6, 2018.  During that visit, Defendant Kabongo observed tears and redness in Plaintiff's left eye, but the area was not swollen. Plaintiff had 20/40 vision in his left eye. Defendant Kabongo referred Plaintiff to NP Burns for further evaluation.

Plaintiff has not presented evidence to support that Defendant Kabongo failed to respond to Plaintiff's complaints or that Kabongo's decisions were medically unacceptable under the circumstances.  On this record, no reasonable jury could conclude that Defendant Kabongo was aware of and disregarded a substantial risk of serious harm to Plaintiff.  The Court concludes there is no genuine dispute of material fact regarding whether Defendant Kabongo was deliberately indifferent to Plaintiff's serious medical needs.

## VI.    Defendants Eye Doctors of Arizona and Heller's Motion

### A.    Parties' Arguments

#### 1.    Defendants' Motion

Defendants Eye Doctors of Arizona and Heller advance five arguments to support their Motion for Summary Judgment.  First, Defendants argue that Defendant Eye Doctors of Arizona was not a state actor under § 1983.  (Doc. 122 at 4.)  Second, Plaintiff has not presented evidence that Eye Doctors of America "had any policies or customs that caused a deprivation of Plaintiff's constitutional rights or that it was enforcing a Corizon or governmental policy or custom that caused a deprivation of his constitutional rights."  (*Id.*

at 5.)   Third, Eye Doctors of Arizona cannot be held vicariously liable for Defendant Heller's conduct.  (*Id.*)  Fourth, Plaintiff has not proven that Eye Doctors of Arizona or Defendant Heller were deliberately indifferent to Plaintiff's serious medical needs.  (*Id.* at 6.)  Fifth, in Arizona, an expert is required in cases like this "to establish that a healthcare provider fell below the standard of care and caused an injury," but Plaintiff failed to disclose any medical evidence or testimony from a medical expert that his condition was inadequately treated and/or worsened" under Defendant Heller's care.  (*Id.* at 7.)

### 2.      Plaintiff's Response

In his Response, Plaintiff contends Defendants are state actors because under Arizona law, the state has a duty to provide medical care to prisoners.  (Doc. 149 at 6.) Plaintiff argues that when private medical physicians or business entities provide medical care to prisoners, "it is presumed that they are state actors."  (*Id.*)  Plaintiff further argues that Defendant Heller was aware of Corizon's policy regarding timely submission of prisoner medical records, that is, that consultants should submit their dictated reports within five days of treating a prisoner, and Heller "repeatedly engaged in conduct" that "significantly delayed [his] medical care and treatment."  (*Id.* at 7.)  Plaintiff contends he "offered clear evidence" that shows that Defendant Heller was aware that Plaintiff "was being forced to stand outside in the cold without clothing in order to attend his medical appointments" and was aware that Plaintiff's serious condition required that he be seen monthly, but Defendant Heller "failed to report Plaintiff's disclosure of abuse," which he knew could substantially injury Plaintiff.  (*Id.* at 7-8.)

### 3.      Defendants' Reply

In their Reply, Defendants argue that Plaintiff fails to present evidence that "a deterioration occurred" or that it was caused by Defendant Heller.  (Doc. 155.)

### B.      Discussion

### 1.      Expert Testimony

Expert testimony is not generally required to show deliberate indifference, especially in cases where a layperson can understand the evidence.  *Reidhead v. Ariz.*, CV-

12-00089-PHX-JAT, 2014 WL 2861046, at *5 (D. Ariz. June 24, 2014) (citing *Sander v. York*, 446 F. App'x 40, 43 (9th Cir. 2011) (deliberate indifference claim did not require expert testimony)).  In any event, for the reasons discussed below, the Court concludes Defendants Eye Doctors of Arizona and Heller are entitled to summary judgment, and the Court need not decide whether expert testimony is necessary.

### 2.      State Action

Defendants are private actors.  There are four ways to determine whether a private actor's conduct qualifies as state action for purposes of § 1983: (1) the private actor performs a public function; (2) the private actor engages in joint activity with a state actor; (3) the private actor is subject to governmental compulsion or coercion; or (4) there is a governmental nexus with the private actor.  *See Gorenc v. Salt River Project Agric Imp. and Power Dist.*, 869 F.2d 503, 507–08 (9th Cir. 1989); *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  "Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Kirtley*, 326 F.3d at 1093 (citing *Lee v. Katz*, 276 F.3d 550, 553–54 (9th Cir. 2002) (internal quotation marks omitted)).  The public function test is satisfied only on a showing that the function at issue is "both traditionally and exclusively governmental." *Id.*  A private physician or hospital that contracts with a public prison system to provide treatment for prisoners performs a public function and acts under color of law for purposes of 1983. *See West v. Atkins,* 487 U.S. 42, 56 n. 15 (1988).  Thus, for purposes of § 1983, Defendants Eye Doctors of Arizona and Heller engaged in state action.

### 3.      Worsened Condition

At Plaintiff's September 18, 2017 visit with Defendant Heller, Plaintiff's vision was 20/20 in his right eye, and "count fingers" in his left eye.  During Plaintiff's final visit with Defendant Heller on March 6, 2018, Plaintiff's visual acuity as 20/400 in his left eye.  Thus, Plaintiff's visual acuity in his left eye improved between September 18, 2017 and March 6, 2018.

With respect to Plaintiff's intraocular pressure, Plaintiff reported that in June 2017, the optometrist noted that Plaintiff's eye pressure was 17 in the right eye and 27 in the left eye. At Plaintiff's December 18, 2017 visit with Defendant Heller, Plaintiff had pressure of 12 in each eye. At his February 6, 2018 visit with Defendant Heller, Plaintiff had interocular pressure of 17 in both eyes. And at Plaintiff's final visit on March 6, 2018, Defendant Heller noted the intraocular pressure in both eyes was within normal limits. Thus, Plaintiff intraocular pressure improved between June 2017 and March 6, 2018.

It is unclear from the evidence whether Plaintiff's macular edema improved or worsened while he was under Defendant Heller's care. Defendant Heller noted during his first visit with Plaintiff that he had macular edema and gave him an Avastin injection. During the September 18, 2017 visit, Defendant Heller assessed Plaintiff with macular edema and gave him another Avastin injection to reduce the swelling. At the November 14, 2017 visit, Defendant Heller noted that it "look[ed] more like a macular hole now," but it had some edema around it, and that if the edema were to "go down, perhaps the macula, which seems normal, possibly normal thickness, would restore his vision." Defendant Heller noted that he gave Plaintiff an Avastin injection. During the December 18, 2017 visit, Defendant Heller noted that Plaintiff had some mild macular edema. At the February 6, 2018 visit, Defendant Heller again assessed Plaintiff with macular edema in the left eye and noted that Plaintiff reported improved vision with previous Avastin injections and requested another injection during the visit, which Defendant Heller did. Thus, from Plaintiff's own report, his vision improved with the Avastin injections.

With respect to the macular hole, Dr. Adelberg diagnosed Plaintiff with a moderately sized macular hole on February 24, 2017, and performed surgery to try to close the hole on March 29, 2017, well before Plaintiff's first visit with Defendant Heller. During Plaintiff's last visit with Defendant Heller on March 6, 2018, Defendant Heller referred Plaintiff to a retinal specialist to try to close the macular hole. The evidence does not support that the macular hole worsened while Plaintiff was under Defendant Heller's care.

In short, the available evidence does not demonstrate that Plaintiff's eye conditions worsened under Defendant Heller's care.   But even assuming Plaintiff's condition deteriorated during the time Defendant Heller treated him, the evidence does not support that his condition worsened *because of* Defendant Heller's treatment or that Defendant Heller acted with deliberately indifference to Plaintiff's medical needs.  Plaintiff has not explained *how* Defendant Heller's treatment or lack of treatment caused his condition to deteriorate, identified any other treatment Defendant Heller should have provided, or presented evidence to support that Defendant Heller's treatment decisions were medically unacceptable under the circumstances.  The record does not support that Defendant Heller provided deliberately indifferent medical care to Plaintiff.

### 4.     Timeliness of Dictated Reports

Regarding the timeliness of Defendant Heller's submission of dictated reports, Defendants assert in their Reply that after four of the six visits Defendant Heller had with Plaintiff, he submitted dictated reports to Corizon within seven business days.  (Doc. 155 at 3.)  Following the August 7, 2017 visit, Defendant Heller provided the dictated report after ten business days.  (*Id.*)  In addition, Defendant Heller provided a cover sheet and Practitioner Consultation Report to Corizon on the day of each visit.  (*Id.* at 4.)  The Practitioner Consultation Report and cover sheet contained diagnoses and recommendations for follow-up appointments.  (*Id.*)  Thus, Defendants contend, after each visit, Corizon was sent the necessary information to schedule follow-up appointments for Plaintiff.  (*Id.* at 4.)

Plaintiff has not presented any evidence to support that Defendant Heller's delay in submitting dictated reports, particularly where Heller sent diagnoses and recommendations to Corizon immediately following his visits with Plaintiff, caused Plaintiff any injury.

### 5.     Follow-Up Visits

According to Plaintiff's medical records Defendant Heller recommended that he return in March, noting that he "should be followed up more frequently."  Plaintiff has not presented any evidence to support that Defendant Heller had any control over how

frequently Plaintiff was scheduled for visits with Heller.  And Plaintiff saw Defendant Heller on February 6, 2018, earlier than his original recommendation.  The record does not support that Defendant Heller was deliberately indifferent with respect to ensuring Plaintiff had follow-up visits with Heller.

### 6. Plaintiff's Report of Abuse/Punishment

In his Response, Plaintiff contends that he disclosed to Defendant Heller that he was "being punished and forced to stand outside in the cold without clothing before his scheduled appointments."  (Doc. 149 at 3.)  Plaintiff asserts that "[i]nstead of addressing the fact that Plaintiff was being punished," Defendant Heller stated that he would schedule Plaintiff for a follow up appointment in two months.  (*Id.*)

In his report from the November 14, 2017 visit, Defendant Heller noted that he asked Plaintiff to return in one month, but Plaintiff said that "it is too cold to come then because they make him stand in the yard."  Defendant Heller noted that he told Plaintiff to return in two months, and Plaintiff "was happy with that."  In his report from the December 18, 2017 visit, Defendant Heller noted that Plaintiff told him that he "did not want to come now because they make him stand outside without his clothes on and he is cold."  Defendant Heller noted that he recommended that Plaintiff return on March 10, 2018, which was Plaintiff's "choice of day."

The available evidence demonstrates that Defendant Heller at least attempted to make Corizon aware that Plaintiff had reported that he was being forced to wait in the cold for his visits with Defendant Heller.  Plaintiff has not stated what else Defendant Heller could or should have done in response to Plaintiff's reports, and he has not presented evidence that he suffered any injury due to Defendant Heller's action or inaction with respect to Plaintiff's reports.  The record does not support that Defendant Heller was deliberately indifferent to Plaintiff's reports of "abuse."

### 7. Policy or Custom

Defendants argue that Eye Doctors of Arizona provided no care to Plaintiff because it was not incorporated until 2019.  (Doc. 122 at 5.)  Defendants contend that Defendant

Heller did business as Eye Doctors of Arizona in 2017 and 2018, but the corporation was not formed until 2019. (Doc. 155 at 2.) Defendants further assert that Eye Doctors of Arizona did not have a contract with Corizon to provide healthcare to prisoners in 2017 and 2018. (*Id.*) The Court need not decide this dispute of fact because even if Eye Doctors of Arizona provided care to Plaintiff in 2017 and 2018, Plaintiff has not demonstrated that Eye Doctors of Arizona had a policy or custom that resulted in a violation of his Eighth Amendment rights.

Defendants contend that Plaintiff has not presented evidence that not providing timely dictated medical reports to Corizon was a policy or custom. For the reasons discussed above, the evidence does not support that Defendant Heller's delay in submitting dictated reports resulted in any harm to Plaintiff. Plaintiff has not presented any other evidence regarding a specific policy or custom that caused a deprivation of his rights.

## C. Conclusion

On this record, no reasonable jury could conclude that Defendant Heller was aware of and disregarded a substantial risk of serious harm to Plaintiff. In addition, no reasonable jury could conclude that Defendant Eye Doctors of Arizona had a policy or custom that amounted to deliberate indifference to Plaintiff's Eighth Amendment rights. Thus, there is no genuine dispute of material fact regarding whether Defendants Eye Doctors of Arizona and Heller violated Plaintiff's Eighth Amendment rights, and the Court will grant summary judgment in favor of Defendants Eye Doctors of Arizona and Heller.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants Eye Doctors of Arizona PLLC and Heller's Motion for Summary Judgment (Doc. 122) and Defendants State of Arizona, Corizon, Johnson, Brinton, Kabongo, and Walton-Sparks's Motion for Summary Judgment (Doc. 131).

(2)     Defendants Eye Doctors of Arizona PLLC and Heller's Motion for Summary Judgment (Doc. 122) is **granted**.

(3)    Defendants State of Arizona, Corizon, Johnson, Brinton, Kabongo, and Walton-Sparks's Motion for Summary Judgment (Doc. 131) is **granted in part** and **denied in part**, as follows:

(a)    The Motion is **granted** as to Plaintiff's claims in Counts One and Two against Defendants State of Arizona, Johnson, Brinton, Kabongo, and Walton-Sparks.

(b)    The Motion is **denied without prejudice** to refiling as to Defendant Corizon if the stay in the bankruptcy proceeding is lifted.  Plaintiff shall either dismiss this case as to Corizon (without prejudice to pursuing any claims in bankruptcy court) or move the bankruptcy court to lift the automatic stay to allow this case to go forward in this forum.    Plaintiff's claims against Defendant Corizon will be dismissed, without prejudice, without further notice on **October 29, 2023,** unless the Court is advised that the bankruptcy stay has been lifted, or a request for a lifting of the bankruptcy stay has not been ruled upon by the bankruptcy court.  If the stay is lifted, Corizon must refile its motion for summary judgment within **15 days** of the stay being lifted.

(4)    Counts One and Two are **dismissed with prejudice**.

(5)    Defendants Eye Doctors of Arizona PLLC, Heller, State of Arizona, Johnson, Brinton, Kabongo, and Walton-Sparks are **dismissed with prejudice.**

Dated this 5th day of September, 2023.

James A. Teilborg
Senior United States District Judge